# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## BEAUFORT DIVISION

| | |
|---|---|
| SUSAN PRESLEY, | ) Civil Action No.: |
| | ) |
| Plaintiff, | ) **COMPLAINT** |
| | ) Violation of Title VII: Termination |
| vs. | ) Based Upon Race; Violation of §1981: |
| | ) Termination Based Upon Race; Violation |
| BEAUFORT COUNTY SCHOOL DISTRICT, | ) of the ADEA; Termination Based |
| | ) Upon Age; Slander Per-Se |
| Defendant. | ) |
| _____ ) | **JURY TRIAL DEMANDED** |

The plaintiff above named, complaining of the acts of the above-named defendant, states as follows:

## PARTIES AND JURISDICTION

1. That the plaintiff is a resident and citizen of the County of Beaufort, State of South Carolina.

2. That, upon information and belief, the defendant Beaufort County School District is a governmental agency/school district doing business and maintaining offices and agents in the County of Beaufort, State of South Carolina.

3. That this court has federal question jurisdiction pursuant to 42 U.S.C. §2000e-2, 42 U.S.C. §2000e-5 ("Title VII"), 42 U.S.C. §1981 ("§1981"), 29 U.S.C. § 623, et seq. (the Age Discrimination in Employment Act or "ADEA"), and 28 U.S.C. §1331.

4. That venue for all causes of action stated herein lies in the District of South Carolina, Beaufort Division, in that pursuant to 28 U.S.C. §1391(b), the parties reside and do business in this district, and a substantial part of the events giving rise to plaintiff's claims occurred here.

**CONDITIONS PRECEDENT**

5. That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below. Moreover, at all relevant times as defined by Title VII and the ADEA, defendant employed fifteen (15) and twenty (20) or more employees. As such, defendant is an "employer" as defined by Title VII and the ADEA and otherwise is subject to those Acts.

6. That on or about October 13, 2017, and as result of defendant's discriminatory conduct, all of which is more fully described below, plaintiff timely filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based upon race and age and constructive discharge.

7. That on or about April 30, 2018, plaintiff received her Notice of Right to Sue from the EEOC regarding the complaint described above in Paragraph 6.

8. That plaintiff has timely filed the foregoing action within ninety (90) days of the date on which she received her Notice of Right to Sue described above in Paragraph 7.

**FACTS**

9. That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 8 hereinabove as fully as if set forth verbatim.

10. That plaintiff is a Caucasian female who, at all relevant times, was over forty (40) years of age.

11. That plaintiff was originally hired by defendant in or around September of 2000 to work as a secretary at Shell Point Elementary School. In or around May of 2002, plaintiff left the defendant to work at SCE&G. On or about August 29, 2005, defendant hired plaintiff back, this time as a bookkeeper at Robert Smalls Middle School, which is now called Robert Smalls International Academy.

12. That during plaintiff's employment at defendant, she performed her job duties in an above-satisfactory fashion and otherwise maintained an excellent employment record. To this point, plaintiff was always rated "above standard" on most metrics in her yearly performance evaluations. In fact, on plaintiff's last performance evaluation dated April 2016, the evaluator commented "Ms. Presley is one of the best bookkeepers that I have worked with in 15 years." Moreover, plaintiff was never disciplined in any shape or form during her 11-12 years of employment at defendant.

13. That as of 2014, when the school became known as Robert Smalls International Academy, plaintiff began to report to the new Principal, Ebonique Holloman ("Holloman"), who is African-American and substantially younger than plaintiff. Holloman, in turn, reported to the Superintendent, Jeffrey Moss ("Moss"), who is Caucasian. Otherwise, in the course of performing her duties, plaintiff had interactions with the school's Athletic Director ("AD"), Office Manager, and the District Accounting Specialist, among others.

14. That during the 2015-2016 school year, Christy McCullough ("McCullough"), who is African-American and forty (40) years old, served as the Assistant AD at the school. Sometime in or around 2016, McCullough was assigned to be the AD at the school for the 2016-2017 school year. McCullough was also a teacher at the school and had been for some time. Of course, almost all of McCullough's income is derived from her job as a teacher. She only received a small, modest stipend for her AD duties.

15. That prior to McCullough, plaintiff had worked with three (3) other ADs (Kircher, McPherson and Raley) all without incident or problems. The Office Manager at the time in question was Patsy Bishop ("Bishop") who is Caucasian. And, the District Accounting Specialist was Linda Blackman ("Blackman") who is African-American and substantially younger than plaintiff.

16. That one of plaintiff's jobs as a bookkeeper involved receiving revenue from home athletic events from the AD. In this regard, after such events the AD is required to provide plaintiff with the revenue generated from the event (usually in a small, zippered bank bag) and a Ticket Sellers' Report. The Ticket Sellers' Report (to be prepared by the AD) identifies, among other things, the number of tickets sold, the price of the tickets, and the total amount of revenue generated from the event. The amounts reflected on the Ticker Sellers' Report should match the amount of cash generated from the game.

17. That after plaintiff receives the cash and Ticket Sellers' Report from the AD, plaintiff inputs data from the Ticket Sellers' Report into a financial management program called Munis on her computer. Plaintiff then prepares a deposit slip for the cash and deposits it into the bank. Thereafter, plaintiff forwards the Ticket Sellers' Report and a deposit slip to the District Accounting Specialist, Blackman, who also receives the same report from seven (7) other middle school bookkeepers at defendant. Plaintiff also sends a copy of the deposit slip and report to the AD.

18. That in addition, the association that the officials worked for would assign officials to work athletic games at the school and thereafter that association would email invoices to the middle school bookkeepers for the said game. Once plaintiff received the invoices from the association she would have the invoices validated by the school's AD and then plaintiff would pay them.

19. That it was the Principal (or Holloman's) job to train the AD on the above procedures. In the past with the other ADs (Kircher, McPherson and Raley) and the prior Principal (Smith) the above procedures were always followed without incident. However, unlike in the past, after Ms. McCullough took over as AD, she failed to provide plaintiff with revenue and Ticker Sellers' Reports for home athletic events occurring in September and

October of 2016. At the same time, the association the officials belonged to failed to provide plaintiff with any invoices for the games the officials worked during that period of time.

20. That at the time, plaintiff erroneously thought McCullough was depositing the revenue into the Athletic Booster Club account and then paying the referees from that account. Plaintiff had nothing to do with the Booster Club account and had no control over it. In all events, McCullough was not using the Booster Club account to deposit money or pay invoices.

21. That on or about October 31, 2016, plaintiff received an email from Melissa Green in Accounts Payable advising that some referee invoices from September had not been paid. Since the referees' association was not providing plaintiff with any invoices, plaintiff had no idea what was going on, and became concerned following the contact by Melissa Green.

22. That on that same day plaintiff immediately checked with McCullough to ensure that the officials actually worked the games in question. In response, McCullough confirmed that the officials had worked the games. Plaintiff then asked McCullough for the cash from the events and the attendant Ticket Sellers' Reports so that plaintiff could deposit the money and pay the officials. McCullough responded that she had the cash and Ticket Sellers' Reports in her room and that she would bring the cash to plaintiff.

23. That McCullough did not bring the cash and reports to plaintiff that day (October 31, 2016) as requested. That as such, on that same day (October 31, 2016) plaintiff notified the office manager, Bishop that McCullough did not provide plaintiff with the cash and Ticket Sellers' Reports. The following morning, November 1, 2016, plaintiff again asked McCullough to bring her the cash and the Ticket Sellers' Reports. Again, McCullough failed to do so.

24. That accordingly, on or about November 1, 2016, plaintiff advised Bishop of the situation. Plaintiff also confirmed via Bishop that no deposits had been made into the

Booster Club account that could cover the officials' pay. Thereafter, on that date (November 1, 2016) plaintiff and Bishop went directly to Holloman and advised her of McCullough's malfeasance. Holloman assured them that she would take care of the matter. Otherwise, on this date plaintiff completed payment request forms to have the invoices from the officials paid.

25. That in or around mid-November 2016, plaintiff and Bishop again went to Holloman and advised her of the issues with McCullough. Again Holloman advised that she would take care of the matter.

26. That on or about December 6, 2016 (over five (5) weeks from the time plaintiff reported the matter to Holloman) McCullough came to plaintiff's office and handed plaintiff a large brown envelope which contained several smaller envelopes. The total amount of cash in each smaller envelope was indicated on the outside of the smaller envelopes. Plaintiff immediately called Bishop to plaintiff's office to count the total amount of cash contained in the envelopes. After Bishop counted the money, it was determined that the envelopes contained $1,656.66. McCullough advised Bishop and plaintiff that the cash was from two (2) games and a staff/student game. When plaintiff asked McCullough for the Ticket Sellers' Reports, McCullough continued to maintain that they were in her classroom. However, McCullough still did not bring the reports to plaintiff.

27. That thereafter, plaintiff filled out a deposit slip and deposited the cash she just received from McCullough in the bank. Consistent with policy, plaintiff then forwarded the original deposit slip to Blackman and a copy to McCullough. However, Blackman did not contact plaintiff as to why there were no Ticket Sellers' Reports accompanying the deposit slip, which she should have done because it was an irregularity. Moreover, Blackman never contacted plaintiff at any time from the beginning of September as to why she had not received any deposit slips or Ticket Sellers' Reports from plaintiff, even though she was receiving

deposit slips and Ticket Sellers' Reports at the same time from seven (7) of defendant's other middle school bookkeepers.

28. That on or about December 16, 2016, plaintiff took a day of annual leave. On that day, Bishop called plaintiff and asked plaintiff to come to school to make a deposit into the Athletic account. The deposit involved cash from two (2) separate sporting events which would require two (2) separate deposits. In counting the money, plaintiff noted a $20 discrepancy between the amount of cash and the totals reflected in the Ticket Sellers' Report. (Apparently by this time McCullough was preparing the Ticket Sellers' Reports). Specifically, the cash count was Twenty ($20) Dollars less than what was reflected on the Ticket Sellers' Report.

29. That around this same time plaintiff advised Holloman (who happened to be walking outside of plaintiff's office) of the discrepancy and plaintiff asked Holloman to have Bishop come to the office to confirm the shortage. After Bishop confirmed that the cash was, indeed, short by $20, Holloman called McCullough and told her to report to plaintiff's office. When McCullough arrived at plaintiff's office, she had $20 with her and she tendered it to plaintiff.

30. That on or about the morning of December 19, 2016, plaintiff was summoned to a meeting with Alice W. Walton ("Walton"), the Chief Administrative and Human Resources Officer at defendant. During the meeting, Walton questioned plaintiff about the handling of funds from home athletic events at the school. At the conclusion of the meeting, Walton asked plaintiff to write a statement of events concerning the athletic funds and Ticket Sellers' Reports. That same day in the afternoon, plaintiff was summoned to another meeting attended by Lori Mock ("Mock"), the Chief Financial Officer of defendant, Walton, Holloman and McCullough. At the conclusion of that meeting, Mock informed plaintiff that plaintiff would be placed on administrative leave with pay. Thereafter, plaintiff received a letter from

Walton placing plaintiff on administrative leave with pay for "alleged inappropriate handling of school funds and bookkeeping procedures and protocols."

31. That also on or about December 19, 2016, defendant reported the matter to the Beaufort County Sheriff's Office as a theft as, apparently defendant believed or alleged it was missing approximately $2,900. The Sheriff's Office conducted a full investigation. In doing so, McCullough was identified as a suspect, while plaintiff, along with several other employees at defendant, were merely identified as witnesses. In the end though, the Sheriff's Office did not make any arrests or charge McCullough with a crime.

32. That on or about February 21, 2017, plaintiff was advised that she would be disciplined for failing to follow guidelines for the collection, recording, and depositing of sports funds. Specifically, defendant believed that plaintiff should have discovered and remedied McCullough's malfeasance earlier (even though plaintiff reported the malfeasance on October 31, 2016, November 1, 2016, and again in mid-November, 2016). Plaintiff was further advised that as such, plaintiff could no longer occupy her bookkeeping position.

33. That at the same time, plaintiff was advised that defendant would be willing to place plaintiff in a classroom aide position, at another school, with a salary of $18,000-$19,000. Plaintiff's salary as a bookkeeper was $37,000, so plaintiff's salary was effectively being cut in half. Moreover, plaintiff was not qualified for the teacher's aide position; she had no prior experience in the position; and, plaintiff was never trained to perform the duties of the position.

34. That at the same time, there were at least two other suitable and available positions defendant could have placed plaintiff in, but defendant refused to do so. Specifically, plaintiff could have been placed into a Guidance Secretary position at the school or an Accounts Payable position at the District.

35. That for all of the above reasons, plaintiff could not accept the teacher's aide position and, as such, on or about March 27, 2017, plaintiff was forced to retire and was, thus,

8

constructively discharged, as defendant intentionally and deliberately made plaintiff's working conditions intolerable and intentionally and deliberately forced plaintiff to quit her job at defendant.

36. That in the end, plaintiff was disciplined in a much harsher manner than substantially younger, African-American employees who engaged in similar or more egregious offenses than the one plaintiff was charged with. McCullough, the primary wrongdoer - who was directly responsible for the missing funds and policy violations - was allowed to return to her teaching position at the same school. Her only punishment was loss of her AD duties, and the minimal stipend she received for performing those duties. Plaintiff estimates that the total loss of income to McCullough was less than $2,500 for the school year. McCullough received this light punishment despite the fact that, upon information and belief, and unlike plaintiff, McCullough had at least two (2) prior disciplinary actions in her file.

37. That for her part, Blackman was not disciplined in any shape or form, despite the fact that she had the same opportunity to address McCullough's malfeasance as plaintiff did (since she, too, received Ticket Sellers' Reports and copies of deposit slips after athletic events from seven (7) of defendant's other middle schools). Likewise, Holloman was not disciplined in any shape or form, despite the fact that she neglected to properly train the AD on cash collection procedures and despite the fact that she, too, did not discover the problem earlier or remedy it faster. McCullough even admits she was never trained on these procedures.

38. That finally, the reason for plaintiff's discipline is false or not credible. Plaintiff had nothing to do with the missing funds, and plaintiff did not violate any policies in relation to McCullough's actions. It was McCullough's job as AD to give plaintiff the cash and Ticket Sellers' Reports immediately after each event. It was not plaintiff's job to oversee or pester the AD about cash and Ticket Sellers' Reports. Nothing in plaintiff's job description requires plaintiff to oversee the AD or question the AD about cash and the attendant Ticket

Sellers' Reports. Plaintiff did not have any supervisory duties whatsoever and it just was not plaintiff's job to ensure the AD was performing her job.

**FOR A FIRST CAUSE OF ACTION:**
**VIOLATION OF TITLE VII**
**RACE DISCRIMINATION**
**(SUSPENSION/DISCIPLINE/**
**TERMINATION/CONSTRUCTIVE DISCHARGE)**

39. That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 38 hereinabove as fully as if set forth verbatim.

40. That at all relevant times as defined by Title VII, defendant employed fifteen (15) or more employees and, thus, is covered by and otherwise subject to Title VII.

41. That plaintiff is Caucasian.

42. That at all times plaintiff performed her job duties at defendant in a manner that met defendant's legitimate expectations.

43. That defendant suspended, disciplined, terminated and constructively discharged plaintiff.

44. That defendant suspended, disciplined, terminated and constructively discharged plaintiff under circumstances that give rise to an inference of race discrimination - namely, defendant did not suspend, discipline, terminate and/or constructively discharge African-American employees who engaged in the same alleged (or similar) behavior as plaintiff.

45. That moreover, defendant replaced plaintiff with someone outside of plaintiff's protected class and/or the position remained open.

46. That defendant suspended, disciplined, terminated and constructively discharged plaintiff because of plaintiff's race and, therefore, defendant has purposefully violated Title VII.

47. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work,

severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

48. That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff and, therefore, plaintiff is entitled to recover punitive damages from the defendant.

**FOR A SECOND CAUSE OF ACTION:**
**VIOLATION OF 42 U.S.C. §1981**
**RACE DISCRIMINATION**
**(SUSPENSION/DISCIPLINE/**
**TERMINATION/CONSTRUCTIVE DISCHARGE)**

49. That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 48 hereinabove as fully as if set forth verbatim.

50. That plaintiff is Caucasian.

51. That at all times plaintiff performed her job duties at defendant in a manner that met defendant's legitimate expectations.

52. That defendant suspended, disciplined, terminated and constructively discharged plaintiff.

53. That defendant suspended, disciplined, terminated and constructively discharged plaintiff under circumstances that give rise to an inference of race discrimination - namely, defendant did not suspend, discipline, terminate and/or constructively discharge African-American employees who engaged in the same alleged (or similar) behavior as plaintiff.

54. That moreover, defendant replaced plaintiff with someone outside of plaintiff's protected class and/or the position remained open.

55. That defendant suspended, disciplined, terminated and constructively discharged plaintiff because of plaintiff's race and, therefore, defendant has purposefully violated 42 U.S.C. §1981.

56. That defendant suspended, disciplined, terminated and constructively discharged plaintiff because of plaintiff's race and thereby purposefully violated 42 U.S.C. §1981 by impairing the terms of plaintiff's employment contract with defendant, including, but not limited to, the making, performance, modification and termination of said contract and the enjoyment of all benefits, privileges, terms and conditions of the said contractual relationship.

57. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

58. That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff and, therefore, plaintiff is entitled to recover punitive damages from the defendant.

### FOR A THIRD CAUSE OF ACTION: VIOLATION OF THE ADEA (SUSPENSION/ DISCIPLINE/ TERMINATION/CONSTRUCTIVE DISCHARGE)

59. That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 58 hereinabove as fully as if set forth verbatim.

60. That defendant is a "person" within the meaning of the ADEA, 29 U.S.C. § 630(a).

61. That defendant is in an industry that affects commerce and defendant employed twenty (20) or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar years, and thus, defendant is an employer as defined by the ADEA, 29 U.S.C. § 630(b).

62. That plaintiff was over forty (40) years of age at the time of defendant's discriminatory conduct as alleged herein.

63. That at all times plaintiff was performing her job duties at defendant in a manner that met defendant's legitimate expectations.

64. That despite the above, defendant suspended, disciplined, terminated and constructively discharged plaintiff.

65. That defendant suspended, disciplined, terminated and constructively discharged plaintiff under circumstances which give rise to an inference of age discrimination - namely, defendant did not suspend, discipline, terminate or constructively discharge substantially younger employees who engaged in the same alleged (or similar) conduct as plaintiff.

66. That moreover, defendant replaced plaintiff with substantially younger employees and/or defendant assigned plaintiff's job duties to substantially younger employees after plaintiff was fired and/or plaintiff's position remained open.

67. That as such, defendant has violated the ADEA by suspending, disciplining, terminating and constructively discharging plaintiff because of her age.

68. That as a result of the actions of the defendant, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, economic injury, and further seeks damages in the form of attorney's fees and costs and prejudgment interest.

69. That defendant's actions were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover liquidated damages from the defendant.

**FOR A FOURTH CAUSE OF ACTION:**
**SLANDER PER-SE**

70. That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 69 hereinabove as fully as if set forth verbatim.

71. That defendant published false and defamatory statements about the plaintiff to employees of the defendant and others in the community without a need to know. Specifically, defendant suspended, disciplined, terminated and constructively discharged plaintiff after conducting an open, widespread investigation into theft which involved law enforcement officers repeatedly visiting the premises and questioning witnesses. By suspending and terminating plaintiff, defendant forced plaintiff to leave the work premises in the midst of said public investigation, giving other employees and persons in the community the belief and understanding that plaintiff committed the crime of theft and embezzlement and that she could not competently perform her job.

72. That all of the statements or publications referred to above concerned the plaintiff, are false, and were made by defendant without justification, without privilege and with implied and actual malice.

73. That the statements referred to above are actionable per-se, in that they allege plaintiff committed a crime and in that they allege plaintiff is unfit to carry on in her given trade and profession.

74. That defendant's publications as outlined above had a defamatory and slanderous meaning, impeached the honesty and integrity of the plaintiff and thereby exposed her to public hatred, contempt, ridicule, and caused her to be shunned and avoided and to suffer loss

of her reputation, embarrassment, humiliation, emotional distress, pain and suffering, and loss of enjoyment of life.

75. That defendant's actions as outlined above resulted in special, general and presumed damages to the plaintiff.

76. That as a direct result of defendant's conduct as set forth above, plaintiff has suffered damages in the form of loss to reputation, lost back and future wages, income and benefits, costs associated with finding other work, psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, loss to professional standing, character and reputation, embarrassment, humiliation, physical and personal injuries and prejudgment interest.

77. That defendant's conduct as described above was undertaken by defendant intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the protected rights of the plaintiff and, therefore, plaintiff is entitled to recover punitive damages from the defendant.

WHEREFORE, plaintiff prays for the following relief against defendant:

(a)   As to plaintiff's First and Second Causes of Action, for such an amount of actual and special damages as the trier of fact may find (including lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the costs and disbursements of this action, including reasonable attorney's fees, prejudgment interest, and for such other and further relief as the court deems just and proper;

(b)   As to plaintiff's Third Cause of Action, for such an amount of actual and special damages as the trier of fact may find (including damages for lost back and future wages,

income and benefits, economic injury, as well as expenses associated with finding other work), liquidated damages, the costs and disbursements of this action, including reasonable attorney's fees, prejudgment interest, and for such other and further relief as the court deems just and proper;

    (c) As to plaintiff's Fourth Cause of Action, for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, expenses associated with finding other work, loss to reputation, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the costs and disbursements of this action, prejudgment interest and for such other and further relief as the court deems just and proper.

               HITCHCOCK & POTTS

               By: *s/A. Christopher Potts*
               Federal ID No.: 5517
               31 Broad Street (P.O. Box 1113)
               Charleston, SC 29401 (29402)
               Telephone: (843) 577-5000
               Email: hitchp@bellsouth.net
               ***Attorneys for the Plaintiff***

Charleston, South Carolina
July 16, 2018