UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Susan Presley, | ) | C/A No. 9:18-1945-BHH-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Beaufort County School District, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Susan Presley ("Plaintiff" or "Presley") filed this action against her former employer,

Defendant Beaufort County School District ("Defendant" or "District"), alleging race discrimination

in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981, and age

discrimination in violation of the Age Discrimination in Employment Act ("ADEA"). She also brings

a state-law-based claim for slander per se. Compl., ECF No. 1. This matter is now before the

undersigned pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a report

and recommendation ("Report") regarding Defendant's Motion for Summary Judgment. ECF No. 39.

Plaintiff filed a response to the Motion, ECF No. 46, to which Defendant filed a Reply, ECF No. 53.

Having reviewed the parties' submissions and the applicable law, the undersigned recommends

Defendant's Motion, ECF No. 39, be *granted in part and denied in part*.

I.      Factual Background[1]

    A.  Plaintiff's position as bookkeeper

Plaintiff, a Caucasian female, was 67 years old when she left Defendant's employ in March

2017. *See* Pl. EEOC Aff., ¶ 3, ECF No. 46-1 (filed with U.S. Equal Employment Opportunity

Commission (EEOC)). Plaintiff was employed by the District as an elementary school secretary from

---

[1] As it must, the court considers the facts in the light most favorable to Plaintiff, the nonmoving party.
These facts are derived from Defendant's Motion and Plaintiff's Response thereto. To the extent
necessary, additional facts are set out in relevant portions of this Report.

September 2000 through May 2002, at which time Plaintiff voluntarily left to take a job as a cashier with SCE&G. In August 2005, Plaintiff returned to work for the District as a bookkeeper at Robert Smalls Middle School, now called Robert Smalls International Academy ("Robert Smalls"). *Id.* ¶ 4; Pl. Dep. 14-16, ECF No. 46-2.[2] Plaintiff's positions as secretary and then as bookkeeper gave her a total of 14 years of employment with the District. Pl. Dep. 18-19, 121.

During the 2015-16 and 2016-17 school years, Plaintiff reported to the principal at Robert Smalls, Ebonique (Nikki) Holloman (now Thomas), an African-American female. Aff. of Ebonique (Holloman) Thomas ¶¶ 1-2, ECF No. 39-3.[3] Plaintiff believes Holloman was 37 years old during the 2015-16 school year, which was her first as the Robert Smalls principal. Pl. Mem. 3. Holloman reported to Dr. Jeffrey Moss ("Moss"), the School Superintendent. Moss is a 58-year-old Caucasian male. Pl. Mem. 3. Alice Williams Walton ("Walton"), the Chief Administrative and Human Resource (HR) Officer, also reported directly to Moss. Walton is female, African American and born in 1969, making her around 47 years old at the time of the incidents described herein. Walton Dep. 9, 21, 24-25, ECF No. 47.

In her deposition Plaintiff identified her general duties as bookkeeper for Robert Smalls as follows: collect money from the Athletic Director ("AD") from home athletic events, count the money, deposit it, pay invoices, order supplies for teachers after approval by the principal, post transactions to different ledger accounts, make budget transfers, balance a checkbook, and oversee the use of a school credit card. Pl. Dep. 20-21, 24-43. Plaintiff indicated her bookkeeping duties had been the same throughout the time she was bookkeeper. *Id.* at 18-21.

Plaintiff was not a supervisor. No one reported to her, and she did not have supervisory duties or authority to hire, discipline, or terminate employees. Deposition of Office Manager Patsy Bishop ("Bishop") 29-30, ECF No. 46-3. Bishop, a Caucasian female who was approximate 60 years old

---

[2] Excerpts of Plaintiff's deposition are also found at ECF No. 39-6.
[3] As the principal went by the surname "Holloman" at times relevant to this litigation she is referred to herein by that name.

when Plaintiff left her bookkeeping job, testified that she saw and spoke to Presley on a daily basis. Bishop Dep. 13-16. Like Plaintiff, Bishop reported to Principal Holloman and did not have any authority to hire, discipline or terminate employees. *Id*. at 14-15.

B.  Process concerning receipt of money from athletic events

Prior to the 2016-2017 school year, Plaintiff typically would receive money from the AD or assistant athletic director ("AAD"). The money would be collected at the gate, placed in a locked bank bag, and given to Plaintiff the day after the game. Pl. Dep. 46-48. Along with the money, the AD or AAD would give Plaintiff a Ticket Seller Report that matched the tickets sold. Pl. Dep. 44-45. Upon receiving the money and the Ticket Seller Report, Plaintiff would count the money to ensure there were no discrepancies. Plaintiff would then make an entry into the accounting ledger regarding the money and make the bank deposit. *Id*. at 45-50. After making the deposit Plaintiff would make copies of the deposit slip, generate an accounting report, and send a copy of the report to Linda Blackman ("Blackman"), the District Accounting Specialist. Plaintiff would also provide the AD with copies of the Ticket Seller Report, the accounting report, and the deposit slip. *Id*. at 45. Blackman, an African-American female who was approximately 56 years old at the time of the events at issue, also received these types of reports from seven other middle schools in the district. Pl. Aff. ¶ 10; Blackman Aff. ¶ 2.

The ADs and AADs were selected by and reported to school principals or the principals' designees. Walton Dep. 114. Dr. Gregory McCord supervised all the ADs in the District. Holloman Aff. ¶ 9. The ADs were responsible for overall management of sport activities at a school, managing the calendar and ensuring referees were hired and paid. Walton Dep. 114. In addition to their regular teachers' salaries, ADs and AADs received a stipend to perform their AD duties. *Id.* at 115-16.

During the 2015-16 school year, Christy McCullough ("McCullough") was employed by the District as a science teacher at Robert Smalls. McCullough, an African-American female, was 42 years old as of the date of her February 7, 2020 affidavit. Affidavit of Christy Smith-McCullough ¶¶

1-2. In years prior to 2016, McCullough had served as a JV basketball and softball assistant coach and as AAD. *Id*. ¶ 4.

C. Events of Fall/Winter 2016

Holloman appointed McCullough to be AD at Robert Smalls in the fall of 2016 when the AD had resigned. McCullough Aff. ¶ 4; Holloman Aff. ¶ 5. Holloman believed McCullough understood her duties, as she had previously been an AAD. Holloman Aff. ¶ 5. Holloman understood that money was collected after each home sporting event and given to Plaintiff to deposit. Holloman was not "involved in" this, nor did she monitor it. She testified that she was "confident [Plaintiff] knew the procedure" as she had been doing her job for a number of years." *Id*. ¶ 6. McCullough, however, testified that she began receiving money from athletic events but was unaware she was to give the money to Plaintiff. McCullough Aff. ¶ 5. Rather, McCullough kept the money in her office and used it to replenish concessions. *Id*. ¶ 6. McCullough kept a record of tickets sold and money received on a notepad, but she "was not told to do anything differently." *Id*.

On October 31, 2016, Melissa Green ("Green"), an employee of Defendant who worked at the District Office, forwarded an email to all the bookkeepers in the district (including Plaintiff) advising there were 10 unpaid invoices that had been sent in September or earlier. These invoices were for services rendered by referees at various schools. Two of the listed invoices concerned games officiated at Robert Smalls. Oct. 31, 2016 email from Green to Plaintiff and others, ECF No. 39-6 at 28. Plaintiff notes that she had not received any invoices for paying referees during the 2016-17 school year. Pl. Dep. 58-59. She noted that, in years past, the invoices would be sent to her within a week after a game had been officiated. Upon receipt, Plaintiff would show the invoice to the AD to confirm the referees had actually worked. If they had (and they always had), Plaintiff would then do a Payment Request and send it to "Accounts Payable" at the District Office so the District Office would mail a check to the officials. *Id*. at 59-60.

Plaintiff testified that receiving this email caused her to realize there might be a problem. Pl. Dep. 58. Plaintiff indicated that, at the time she was not receiving revenue, Ticket Seller Reports, or invoices for work by referees (in September and October 2016), she "erroneously thought perhaps McCullough was depositing the revenue into the Athletic Booster Club account and then paying the referees from that account. Pl. Aff. ¶¶ 12-13. Plaintiff testified that it was not "in her job description to supervise" the AD and she had never been told she needed to go to the AD to request the money. Plaintiff agreed that no one had told her she could not ask the AD for money from sporting events. Pl. Dep. 53-54.

On the day she received the email regarding the unpaid referee invoices (October 31, 2016) Plaintiff went and advised Office Manager Bishop that that officials were not getting paid and that Plaintiff had not received any gate money from McCullough since the school year began. Pl. Dep. 61-62. Plaintiff indicated she went to Bishop because Holloman had instructed employees to go through Bishop if they needed to contact Holloman. *Id*. at 62. Bishop advised Plaintiff that they needed to bring this to Holloman's attention.

On or about October 31, 2016, Plaintiff checked with McCullough to ensure the officials had actually worked the games in question. She confirmed that they had. Pl. Aff. ¶ 15. Plaintiff then asked McCullough for the cash from the events and the Ticket Seller Reports so Plaintiff could deposit the money and then have the referees paid. *Id*. McCullough advised Plaintiff that she had the cash and the Reports in her office and that she would bring them to Plaintiff. *Id*. McCullough did not take the cash or the Reports to Plaintiff on October 31, 2016, and Plaintiff so advised Bishop. *Id*. ¶ 16.

On November 1, 2016, Plaintiff again asked McCullough to send her the cash and the Reports. McCullough did not do so. *Id*. Plaintiff again advised Bishop. Pl. Aff. ¶ 17. Plaintiff further advised Bishop that no deposits had been made into the Booster Club account that could cover the officials' pay. *Id*. Plaintiff and Bishop then went to Principal Holloman to advise her of the situation. Pl. Dep.

62.[4] *Id*. During the meeting with Holloman on that day, Plaintiff advised her that she had not received any gate money from McCullough at all thus far in 2016 and that she had received the email from Green about the referees not being paid for home athletic events at the school. In response, Holloman stated that she would take care of it. Pl. Dep. 62, 67.[5] Later on November 1, 2016, Plaintiff completed payment request forms to have the invoices from the officials paid. Pl. Aff. ¶ 17.

Plaintiff testified that, a few days later, she again asked McCullough for the gate money but McCullough did not provide it. Plaintiff went ahead and paid the invoices for the referees with money left over from the previous year's student activities account. Pl. Dep. 69-17, 77. In mid-November 2016 Plaintiff and Bishop again went to see Holloman and advise her of the issues with McCullough's not providing the money or reports. Holloman advised that she would take care of the matter. Pl. Aff. ¶ 18.

McCullough testified that she had been unaware that of the procedure to forward money to Plaintiff and complete a form called the Ticket Seller Report until Plaintiff explained it to her in November 2016. McCullough Aff. ¶ 8. McCullough indicated that she had a meeting with Holloman in which Holloman "talked about financial matters, as she said she had received complaints." McCullough Aff. ¶ 9. This discussion included the "misunderstanding [McCullough] had with handling the money from sporting events," and McCullough told Holloman she now knew what needed to be done. *Id*. Holloman indicated this meeting took place in November 2016, after she had learned from Plaintiff that McCullough had not been providing money from sporting events. Holloman Aff. ¶ 7.

---

[4] Bishop believes she and Plaintiff went to see Holloman that same day, October 31, 2016. *Id*. In Plaintiff's Affidavit and her deposition she indicates she and Bishop went to Holloman on November 1, 2016. Pl. Aff. ¶ 17; Pl. Dep. 62.
[5] Plaintiff later forwarded the October 31, 2016 email to Holloman. ECF No. 39-6 at 28 (email forwarded to Holloman on November 17, 2016).

Around December 6, 2016,[6] McCullough gave Plaintiff a large brown envelope that contained several smaller envelopes. The front of each smaller envelope included a handwritten notation indicating the amount of cash contained therein. Pl. Aff. ¶ 19. Plaintiff immediately asked Bishop to come to Plaintiff's office to count the total amount of cash contained in the envelopes. After Bishop counted the cash, it was determined that the envelopes in total contained $1,656.66. McCullough indicated the cash was from two sporting events and a staff/student game. *Id*. McCullough did not provide any Ticket Seller Reports with the cash. She advised that she had the Ticket Seller Reports in her classroom; however, she never provided them to Plaintiff. *Id.* Plaintiff then deposited the money and sent the deposit slip to Blackman and a copy to McCullough. *Id*. ¶ 20. Holloman testified that, after McCullough had provided Plaintiff with the money McCullough had already received, Holloman "thought this matter was resolved and was just a misunderstanding and miscommunication." Holloman Aff. ¶ 8.

A few days after her meeting with McCullough, Holloman reported what she had been told to Dr. Gregory McCord, who supervised ADs. Holloman Aff. ¶ 9. McCord advised Holloman to inform Walton and the Finance Department. She did so. *Id*. ¶ 10.

The record includes a December 7, 2016 email chain in which Holloman provided a bulleted memorandum regarding matters related to McCullough and Plaintiff. ECF No. 46-3 at 3-33. Superintendent Moss forwarded Holloman's bulleted memorandum to several people, including McCord and Walton. *Id*. Holloman's memorandum included the following information:

- When McCullough was named AD, the bank holding the Athletic Booster account contacted Holloman and advised it could not approve McCullough to have her name on the checking account or to withdraw money from the account. The bank indicated the reasons for this were confidential. Accordingly, Holloman's office manager's name was put on the account, and the office manager [Bishop] received the bank statements.
- Holloman expressed "grave concern" over the fact that her office manager had recently shared with her and the bookkeeper [Plaintiff] that no deposits had been made to the

---

[6] McCullough recalls this occurring "in November." McCullough Aff. ¶ 8. Holloman indicates this took place after her meeting with McCullough. Holloman Aff. ¶ 8. The precise date of this event does not impact the recommendation within.

account since August 31. Deposits that should have been made would include gate and concession money from football, volleyball, the basketball jamboree, and the student-faculty basketball game. Holloman verified this by reviewing the bank statement her office manager had received.

- Holloman noted the following: "My bookkeeper became involved because she is the landlord for [McCullough] and shared that she met with her last week to share that she will provide a formal letter to evict her from my bookkeeper's property in Pope Village. She said that [McCullough] came back 15-20 minutes later and paid the rent and back rent with all cash."

- Holloman has met with McCullough "due to getting calls from collections from Big D's Tees (still owed money from last summer and where my assistant principal's wife works), Coca Cola Bottling (my husband's employer), T&D sports, World's Finest Chocolate, and a bumper sticker company. Each time she assures me that the money was sent and that this is an error."

- Holloman indicated, "I need an additional layer of evidence other than telling her that everyone is not lying."

- McCullough has never submitted Ticket Sales reports that should go to Blackman. Holloman has not heard from Blackman about this, so it is possible those reports are no longer needed. However, Holloman has no evidence of how much money should be in the account or how much was collected during the events.

- Holloman emailed McCullough and indicated they needed to meet and discuss receipting and deposit concerns from the Athletic Booster account. The next day (the day before the bulleted memorandum was submitted) McCullough turned in "stacks of cash" to Plaintiff. The cash was over $1600.00 but no paperwork was included.

- Holloman ended by noting that both Plaintiff and Bishop could verify this information.

ECF No. 46-3 at 32-33.

In the forwarded email Moss asked Holloman whether there were processes in place that would have alerted her that deposits were not occurring. He questioned whether, if calls had been coming to bookkeeper regarding past-due accounts, had someone been asking for proof of payment. ECF No. 46-3 at 31. Moss requested that Holloman "gather all relevant documents and processes in place to show the trail of money and Finance will contact you to determine the next steps." *Id*. Holloman responded within a few minutes, advising Moss she would gather the relevant information. *Id*. She noted the usual process had been for the AD to submit the ticket collections form to the bookkeeper the day after the event and the deposit should be made that evening if over $25. Holloman noted the process had worked smoothly with the prior ADs. Holloman said she was not aware the deposits were not being made that year "until [Plaintiff] brought it to my attention after the office manager urged her to do so." Plaintiff advised Holloman she had asked McCullough for the

paperwork, but McCullough made excuses and said she would bring it later, but she never did. Plaintiff advised Holloman she was bringing this to her attention at this point because the account "has RSIA in it and didn't want any trouble for her nor I." *Id.*

Later on December 7, 2016, Plaintiff emailed Holloman, asking what Holloman had said to Blackman so Plaintiff would know before she spoke with Blackman. ECF No. 39-6 at 29. Plaintiff said she "hope[d] this [did]n't put [her] in the wrong" such that she would get written up over this. Plaintiff said, "I did what I thought was right. [T]hen the officials['] bills came in and I thought she [McCullough] was paying them out of the booster club so I didn't question it. [W]ow I think this is going to be a big big mess." *Id.* Less than one hour later Holloman forwarded Plaintiff's email to Moss, Walton, and others, indicating the email came after Holloman had asked Linda Blackman to double check as to how game officials had been getting paid. ECF No. 39-6 at 29. Holloman notes that it appears Plaintiff had been using school funds with an expectation of getting paid back when the booster account had money. Holloman indicated she would not discuss with Plaintiff before Plaintiff answered Blackman's questions. She ended the email, "Where there is smoke, there is fire. Tonya could you audit where the bookkeeper was transferring funds to cover for my AD; hence there was no red flag for the DESC and me?" *Id.*

On December 16, 2016, Plaintiff was called in from an annual-leave day because McCullough had instructed a District employee, "Mr. D.," to deliver to Plaintiff or to Bishop a large envelope containing Ticket Seller Reports and $820 in cash that had been received from two basketball games. Pl. Aff. ¶ 21; Bishop Dep. 71-73. Bishop asked Plaintiff to come in so she could count and deposit the money in the athletic account. Pl. Aff. ¶ 21. Plaintiff did so. When she counted the money, she found that the cash was $20 short from what was reflected on the Ticket Sellers Reports. Plaintiff informed Holloman, and they had Bishop come in and count the money, as well. *Id.* ¶ 22. Bishop confirmed the shortage. Holloman called McCullough to meet with them in Plaintiff's office. McCullough had $20 with her and tendered it to Plaintiff when she arrived in Plaintiff's office. *Id.*

On or about December 19, 2016, Walton came to Robert Smalls and met with Plaintiff and Holloman in Holloman's office. During the meeting, Walton asked Plaintiff to prepare a written statement in regard to the unpaid referees and missing money. Presley then prepared the statement and provided it to Walton that same day or the next day. Pl. Dep. 78, 89-91, 99; Pl. Statement (dated Dec. 20, 2016), ECF No. 46-2 at 98-99. Later that same day, Plaintiff and McCullough were called into a meeting with Superintendent Moss, HR Director Walton, Finance Director Lori Mock ("Mock"), and Holloway. Plaintiff was summoned to another meeting attended by Mock, Defendant's Chief Financial Officer; Moss; Walton; Holloman; and McCullough. Holloman Aff. ¶ 11; Pl. Dep. 92; McCullough Aff. ¶ 10. During this meeting Moss stated that money was missing from the District and he questioned McCullough about it. For her part, McCullough did not know what to say; she cried and said she could not explain where the missing money was. Moss then brought up the fact that McCullough rented her home from Presley, indicating that the two were in collusion. Both Plaintiff and McCullough denied that charge. Plaintiff explained that she had been renting to McCullough since before she became AD, and she saw no reason or actual or potential conflict of interest that would require her to ask her tenant to move. Moss asked Plaintiff why red flags were not raised when she was not receiving gate money. Plaintiff responded that she thought McCullough was putting the money in the Booster Club account—an account with which Plaintiff was not involved. Pl. Dep. 92-95.

The District placed Plaintiff and McCullough on administrative leave with pay pending an investigation by law enforcement. Pl. Dep. 95; McCullough Aff. ¶ 11. Moss is the one who advised Plaintiff she was being placed on leave. Pl. Dep. 95. Walton testified that she and Moss made the decision to place Plaintiff and McCullough on administrative leave and that Holloman gave no opinions or recommendations concerning that decision. Walton Dep. 54-56; *see also* Holloman Aff. ¶ 13. Walton met with both Plaintiff and McCullough to discuss their leave. Walton Dep. 144-46. Plaintiff turned in her badge and keys. The suspension letter indicated the leave with pay took effect

the following day (December 20, 2016) and that the action was being taken "because of alleged inappropriate handling of school funds and bookkeeping procedures and protocols." Suspension Letter, ECF No. 46-2 at 97. (This letter is dated December 19, 2017. However, that appears to be a typographical error.)

Also on December 19, 2016, Defendant contacted the Beaufort County Sheriff's Office to report an incident of potential stolen property. *See* Beaufort County Sheriff's Office Report, ECF No. 39-8 at 1-2. The Incident Report identified Plaintiff, Bishop, and Holloman as witnesses; it identified McCullough as a "suspect." *Id*. at 2. The Sheriff's Office sent deputies to Robert Smalls at least twice. Bishop was interviewed there by an uniformed deputy. Bishop Dep. 33-35. Bishop noted others were around when the uniformed deputy came to the school. *Id*. at 34. Ultimately, the Sheriff's Department did not arrest or charge anyone with a crime, including McCullough. Pl. Aff. ¶ 24.

D. Events of March 2017

Plaintiff and McCullough were advised they could return to work in March 2017, but they were to be restricted from working in any position that handled money. Walton testified that Superintendent Moss made that decision. Walton Dep. 58, 149. Holloman testified that she was not involved with making that decision. Holloman indicates Moss made that decision because McCullough failed to turn in money collected and Plaintiff did not report that failure in a timely manner. Holloman Aff. ¶¶ 14-15. Plaintiff notes that her prior attorney had met with the District's in-house counsel regarding her potential reinstatement and that she and her former attorney had a meeting with Moss and District counsel on or around March 1, 2017, during which she pleaded her case and attempted to convince him that she should be returned to her bookkeeper position and receive a lesser punishment, such as a written reprimand. Moss declined her request and indicated to Plaintiff he did not need to keep a copy of her written statement nor had he read the Sheriff's investigative file. Pl. Dep. 106-13.

Because Plaintiff's prior bookkeeper position involved handling money, she was offered a teacher's aide position at another school. Plaintiff was advised that she would be paid her bookkeeper salary through March 31, 2017; and that starting in April of 2017 she would occupy a teacher's aide job earning $18,000-$19,0000 a year. Pl. Dep. 113-14, 117, 120-121.[7] The teacher's aide position was one of the few open "classified," *i.e.*, non-certified-teacher positions available at that time. Walton Dep. 166-69, 174-76. Plaintiff had the option to apply for any other classified job that opened in the District, as long as it did not involve handling money. Walton Dep. 166-69, 174-76.

McCullough returned to her teaching position, but she did not return to her AD position. She retained her teacher's salary of $37,913 but no longer received the $1,627 stipend for AD duties. Walton Dep. 116-18.

On or about March 3, 2017, Plaintiff called Walton and told her she felt she was being forced to resign and retire and that she could not take the teacher's aide job because of the low salary. Walton advised Plaintiff that, if she was going to retire, Walton needed a letter to that effect by 5:00 p.m. that day. Pl. Dep. 122-23; Walton Dep. 103. Plaintiff sent an email to Walton on March 3, 2017 as notification of her "resignation to retire effective March 31, 2017." ECF No. 46-2 at 100.

E.   Administrative action

On October 13, 2017, Plaintiff filed a claim with the EEOC, alleging "discrimination based upon race and age and constructive discharge." Compl. ¶ 6. The EEOC dismissed her charge and provided a Notice of Right to Sue on April 30, 2018. *Id.* ¶ 7. Plaintiff filed her Complaint in this court on July 16, 2018.

---

[7] Defendant indicates Plaintiff was to be permitted to retain her bookkeeper salary ($37,000 in the 2016-17 school year) for the remainder of that school year and the next (through June 2018). Walton Dep. 166-69, 174-76. Plaintiff testifies that she was unaware that she would retain her bookkeeper salary for any amount of time beyond March 31, 2017. Pl. Dep. 117. For purposes of this motion, the court accepts Plaintiff's testimony regarding what her teacher's aide salary would be.

II.     Motions for summary judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). In discrimination cases, a party is entitled to summary judgment if no reasonable jury could

rule in the non-moving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (Title VII). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

III.    Analysis

    A.  Discrimination claims: framework

    A plaintiff may demonstrate a violation of Title VII, § 1981, and the ADEA with direct and indirect evidence or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (Title VII); *e.g., Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) (evaluating § 1981 racial discrimination claim and a Title VII racial discrimination claim using the burden-shifting framework set out by *McDonnell Douglas*); *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019) (ADEA). Plaintiff's burden of establishing a prima facie case is "relatively modest." *Bryant v. Aiken Reg'l Med. Ctrs., Inc*., 333 F.3d 536, 545 (4th Cir. 2003) (internal quotation omitted).

    Here, Plaintiff relies on the burden-shifting framework to establish her race- and age-based claims. Pursuant to this framework, once the plaintiff establishes a prima facie case of a statutory violation, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff alleging discrimination to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). While intermediate evidentiary burdens shift back and forth, the ultimate burden of persuasion that the defendant engaged in intentional discrimination remains at all times with the plaintiff. *See Reeves,* 530 U.S. at 146–47 ("The ultimate question is whether the employer intentionally discriminated, and proof that 'the

employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'") (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993)). Nonetheless, in considering an employee's pretext argument, there is nothing in the "*McDonnell Douglas* burden-shifting framework that says 'a plaintiff must always introduce additional, independent evidence of discrimination.'" *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 220 (4th Cir. 2016) (quoting *Reeves,* 530 U.S. at 149)). "To the extent that the evidence supporting a plaintiff's prima facie case also undermines the employer's non-retaliatory justification, that evidence may be called upon by the trier of fact in determining whether or not the proffered justification is pretextual." *Id.* at 220. The court is ever mindful, too, that the burden-shifting inquiry is "meant only to aid courts and litigants in arranging the presentation of evidence." *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 515–16 (4th Cir. 2006) (quoting *Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 986 (1988)).

B. Race-based discrimination (Title VII and 42 U.S.C. § 1981)

a. Prima facie case

Plaintiff claims she was disparately disciplined and that that discipline ultimately resulted in her constructive discharge. Although they set out somewhat different formulations of the prima facie analysis, the parties appropriately agree that the same analysis applies to Title VII and § 1981 claims. The *McDonnell Douglas* prima facie case requirements were "never intended to be rigid, mechanized, or ritualistic." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). Generally, to establish a prima facie case in the specific context of a discriminatory discharge claim when disparate discipline is alleged, a plaintiff must show that: "(1) [s]he was a member of a protected class; (2) [s]he was satisfactorily performing [her] job at the time of the termination; (3) [s]he was terminated from [her] employment; and (4) the prohibited conduct in which [s]he engaged was comparable in seriousness to misconduct of other employees outside the protected class who received less severe discipline." *Haynes v. Waste Connections, Inc*., 922 F.3d 219, 223 (4th Cir. 2019) (citing *Hoyle v. Freightliner,*

*LLC*, 650 F.3d 321, 336 (4th Cir. 2011)). As noted by Plaintiff, the fourth prong also may be established by Plaintiff's showing that her position "remained open or was filled by similarly qualified applicants outside the protected class." *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005). Further, in a discriminatory discharge matter concerning the enforcement of employee disciplinary measures, the fourth prong could be established by showing that "other employees who were not members of the protected class were retained under apparently similar circumstances." *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir. 2002).

     *Member of a protected class*: Plaintiff is Caucasian. Regarding the first prong—membership in a protected class—Defendant urges the court to apply the heightened standard set out in *Youmans v. Manna, Inc*., 33 F. Supp. 2d 462, 464 (D.S.C. 1998) (requiring non-minority plaintiff to "establish background circumstances which support the suspicion that [employer] is among those unusual employers who discriminate against the majority."). Def. Mem. 9-11; *see also* Reply 1-2 (noting Plaintiff did not address this portion of Defendant's argument). It is surprising that Plaintiff opted not to respond to this portion of Defendant's summary-judgment argument. Nonetheless, the Fourth Circuit has not expressly decided whether "reverse discrimination" cases place a higher prima facie burden on plaintiffs. *See McNaught v. Virginia Cmty. Coll. Sys.,* 933 F. Supp. 2d 804, 819 (E.D. Va. 2013) (discussing circuit split, the absence of controlling authority on the issue in this circuit, and concluding that "[a]fter reviewing the cases on both sides [of the circuit split], . . . [the court] will apply the standard *McDonnell Douglas* test and will not require [plaintiff] to make an enhanced showing."). While some courts in this District have imposed the heightened standard, others have not. *E.g.*, *Moore v. Rural Health Servs., Inc.*, No. CIV.A.1:04 376 RBH, 2007 WL 666796, at *9 n.9 (D.S.C. Feb. 27, 2007). In the absence of controlling authority imposing the heightened standard, the undersigned applies the traditional *McDonnell Douglas* framework herein. *See generally McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280 (1976) (holding "Title VII prohibits racial discrimination against the white petitioners" using the "same standards as would be applicable" were

16

they Black); EEOC Compliance Manual ¶ 8710, § 15-II "What is 'Race' Discrimination?" (noting the EEOC "applies the same standard of proof to all race discrimination claims, regardless of the victim's race or the type of evidence used."). The undersigned finds Plaintiff has satisfied the first prong.

*Satisfactory performance at the time of adverse employment action*: Plaintiff argues she has established that she was meeting Defendant's legitimate expectations at the time of the adverse action. Pl. Mem. 19-20. Defendant analyzes Plaintiff's race-based disparate treatment claim using a slightly different prima facie-case formulation—one that does not include the employee to show satisfactory performance in the disparate-treatment setting. Def. Mem. 9 (citing three-pronged standard from *Hurst v. District of Columbia*, 681 F. App'x 186, 190 (4th Cir. 2017)). In considering plaintiff's claim that her termination was impermissibly discriminatory, the *Hurst* court found that a claim of "race discrimination under Title VII premised upon the enforcement of employee disciplinary measures," requires a plaintiff to show: " (1) that she is a member of the class protected by Title VII, (2) that the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against her were more severe than those enforced against those other employees. *Hurst*, 681 F. App'x at 190 (citing C*ook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993)). *See also Lightner v. City of Wilmington*, 545 F.3d 260, 264-65 (4th Cir. 2008) (setting out a similar prima facie standard).

Arguably, then, Plaintiff need not show "satisfactory performance" for a claim based on disparate discipline. In any event, because Plaintiff argues she has established satisfactory performance and because Defendant disputes this prong in seeking summary judgment as to the ADEA claim the court considers whether, for purposes of a prima facie case, Plaintiff has established she was performing satisfactorily at the time she was disciplined and terminated.

In arguing she has shown satisfactory performance at the time of the adverse action Plaintiff notes she previously had received above-average-to-excellent performance evaluations through the

spring of 2016 and had never been disciplined during her employment with the District. Pl. Mem. 19-20 (citing to her deposition). Defendant argues Plaintiff cannot establish this portion of her prima facie case because she was not meeting Defendant's legitimate expectations at the time the adverse action was taken. Def. Mem. 19. Defendant submits that the "evidence clearly reflects that the Plaintiff had failed to follow financial procedures and protocols, of which she was well aware, and failed to take steps to receive the tickets sales and ticket sellers reports from the [AD], and when they were not forthcoming, to report the matter to her supervisor." Def. Mem. 19. Defendant submits these "failures are undisputed." *Id*.

The undersigned disagrees with Defendant. Plaintiff has set out facts which, construed in her favor, could cause a reasonable juror to question whether she had failed to perform satisfactorily or meet Defendant's "legitimate expectations." When Plaintiff's "evidence creates an issue of fact as to whether . . . the stated reasons for Plaintiff's termination were simply a 'sham designed to hide the employer's discriminatory purpose,' and, therefore, not 'legitimate,'" summary judgment on [this] prong is inappropriate. *Young v. CareAlliance Health Servs.,* No. 2:12–2337–RMG, 2014 WL 4955225, at *4 (D.S.C. Sept. 29, 2014). In *Warch v. Ohio Casualty Insurance Co.,* 435 F.3d 510, 515–16 (4th Cir. 2006), the Fourth Circuit stated that it was "cognizant of the danger that courts might apply the 'expectations' or 'qualification' element of the prima face too strictly in some cases, resulting in the premature dismissal of potentially meritorious claims of unlawful discrimination." *Id.* at 516. Here, Plaintiff argues that Defendant's expectations were not legitimate. Plaintiff points to undisputed testimony that she did not have supervisory authority over McCullough, nor was she authorized to train, admonish, or discipline McCullough. Pl. Mem. 46 (citing Walton Dep. 101-02, 118; Bishop Dep. 29-30). Plaintiff has at least raised a genuine issue of material fact as to whether she was performing up to Defendant's legitimate expectations, given the factual issues concerning her authority over McCullough and the protocols she allegedly violated. This consideration is influenced by Plaintiff's exemplary record up until the time of her suspension and discipline.

*Adverse employment action*: Plaintiff submits she was subjected to adverse employment actions, including her suspension[8] and her demotion to the position of a teacher's aide or a classroom assistant at another school. Plaintiff indicates these positions would be "less prestigious" and, importantly, she claims the salary would have been approximately $18,000-$19,000/year, significantly less than her $37,000 salary as bookkeeper. She also notes that, had she remained as bookkeeper, she would now be earning $42,500. Pl. Mem. 18-19. Plaintiff submits that she was constructively discharged based on the "extent of the [salary] reduction and the low-level status of the new position." *Id.* at 19.

Defendant argues, however, that Plaintiff did not suffer an adverse action. Def. Mem. 15-17. Defendant submits that Plaintiff's suspension was with pay and that the other discipline—removal from bookkeeper position and transfer to a different position[9]—was never effected because Plaintiff voluntarily resigned her position effective March 31, 2017. Appropriately, Defendant does not argue that the discipline of transfer to a job paying approximately half of her salary would not itself amount to an adverse action. The court notes that the planned discipline of stripping Plaintiff of her bookkeeper responsibilities and demoting her to a position with a greatly reduced salary, had they taken place, would certainly be considered adverse employment actions. An adverse employment action is an action "that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC,* 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)).

---

[8] Plaintiff does not affirmatively pursue her paid administrative suspension as a separate actionable adverse action.

[9] Defendant maintains Plaintiff would have remained at her bookkeeper's salary through the following school year (2017-2018) and has produced evidence to that effect. However, Plaintiff has testified that, at the time she made the decision not to accept the demotion she understood her salary would be diminished at the end of March 2017. Plaintiff's evidence is, of course, accepted as true for purposes of considering this motion.

Defendant argues, however, that because Plaintiff resigned and retired from the District rather than accept the other position, no adverse action took place. Defendant submits this resignation should not be considered a constructive discharge. Def. Mem. 15-17. Citing *Bristow v. Daily Press, Inc.*, 770 F.2d 1251 (4th Cir. 1985), *inter alia*, Defendant argues constructive discharge "occurs when 'an employer deliberately makes an employee's working conditions intolerable and thereby forces [her] to quit [her] job." Def. Mem. 16 (citing *Bristow*, 770 F.2d at 1255).

The undersigned agrees with Defendant that Plaintiff's resignation/retirement transforms the analysis into one focused on whether a constructive discharge took place. However, Supreme Court and Fourth Circuit decisions subsequent to *Bristow* set out a somewhat different standard for considering whether a resignation might be considered a constructive discharge. "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.' When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge." *Green v. Brennan*, 136 S. Ct. 1769, 1776–77 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 141–43 (2004)). For constructive discharge, the Fourth Circuit has interpreted *Green* to no longer require a plaintiff to establish deliberateness or "a subjective intent to force a resignation," but only "objective 'intolerability'—'circumstances of discrimination so intolerable that a reasonable person would resign.'" *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017) (quoting *Green*, 136 S. Ct. at 1779). The Fourth Circuit has found that "[d]emotion can constitute a constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (citing *Jurgens v. EEOC,* 903 F.2d 386, 391–92 (5th Cir. 1990)).

Here, Plaintiff has submitted sufficient evidence to permit a fact-finder to conclude that her demotion to an aide position at a different school—one that paid only half of her bookkeeper's salary

and had diminished responsibilities—would be objectively intolerable. Plaintiff has established the adverse-employment-action prong of her prima facie case by submitting sufficient evidence to support a constructive discharge.

*Evidence concerning filling of prior position or comparator evidence*:

*Filling bookkeeper position*: One way Plaintiff can establish the final prong of her prima facie case is by showing that her position remained open or was filled by a similarly qualified person outside the protected class. *Miles*, 429 F.3d at 485. Construed in the light most favorable to Plaintiff, the record facts regarding the bookkeeping position are as follows:

- December 2016, when Plaintiff was placed on leave: The bookkeeping duties for Robert Smalls were shared between Bishop, a then-approximately-60-year-old Caucasian female who worked as Office Manager, and Blackman, a then-55-year-old African-American female who continued her duties as a District Accounting Specialist. Blackman Aff. ¶¶ 1-2, 10-11. Plaintiff indicates that Blackman, not Bishop, had bookkeeping expertise. Bishop indicated Blackman drove to Robert Smalls two-to-three times per week to perform such duties. Bishop estimated that Defendant had Blackman perform 80% of Plaintiff's prior duties. *See* Pl. Mem. 16 (citing to Bishop Dep. 36-39; *however, those pages of the Bishop Deposition are not in the provided record*).
- April 1, 2017 through June 2017: After Plaintiff separated from employment with the District on March 31, 2017, the shared-bookkeeper-duties arrangement continued between Blackman and Bishop.
- July 10, 2017: Mary Dorsey, a Caucasian female who was approximately 50 years old at that time, was hired as Robert Smalls bookkeeper, thereby becoming Plaintiff's permanent replacement. Walton Dep. 107, 110-11.

Plaintiff argues she can establish the fourth prong because the position remained open for over three months—from the end of March 2017 (when she was separated from employment) until July 10, 2017 (when Dorsey began work). Further, she submits the performance of 80% of the bookkeeping duties by Blackman, who is outside Plaintiff's protected class, satisfies this prong of the prima facie case. *See* Pl. Mem. 21-22 (citing *Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 628 (4th Cir. 2015); *Duffy v. Belk, Inc.,* 477 F. App'x 91, 94–95 (4th Cir. 2012)). The cases Plaintiff cites relate more to the reassignment of duties when a position is eliminated. In any event, accepting all facts in the light most favorable to Plaintiff, and noting Plaintiff's light burden of establishing a prima facie case, the undersigned recommends finding Plaintiff has satisfied the fourth and final prong

of her prima facie case of race discrimination by providing evidence that the bulk of her bookkeeping duties were reassigned to Blackman, an African-American female, for several months before the position was more permanently filled. *Cf. Goode*, 807 F.3d at 628 (noting plaintiff could plead prima facie case of age discrimination by showing employer distributed some of plaintiff's prior job duties to one outside plaintiff's class). The undersigned acknowledges this reassignment potentially is undercut by Defendant's later hiring someone within Plaintiff's protected class (Caucasian) for the bookkeeper job. Nonetheless, the prima facie burden is not an onerous one.

*Comparator evidence*:

Plaintiff also submits she has presented sufficient comparator evidence to satisfy the fourth prong of her prima facie case of race discrimination. The Fourth Circuit has recently discussed the significance of comparator evidence, clarifying that a plaintiff need not demonstrate that the comparator is identically situated to her for a valid comparison. *Haynes*, 922 F.3d at 223-25. The *Haynes* court stated:

> Turning first to the issue of an appropriate comparator, this Court has emphasized that a comparison between similar employees "will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993). Rather, to establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

*Id.* at 223-24 (alterations and omission in original). Comparators need not have held the exact same position or title to be considered similarly situated. *Saxton v. Town of Irmo Police Dep't*, No. CV 3:15-1244-JFA, 2017 WL 676579, at *3 (D.S.C. Feb. 21, 2017).

Plaintiff takes an expansive view of who her comparators would be, arguing AD/Teacher McCullough (African American, 42 years old), Principal Holloman (African American, 37 years old), and District Accounting Specialist Blackman (African American, 55 years old) were similarly situated and were disciplined differently (or not at all) despite involvement in the same situation that

resulted in Plaintiff's suspension, demotion, and resulting constructive discharge. *See* Pl. Mem. 20, 24-28. In its principal brief Defendant argues none of these individuals was similarly situated to Plaintiff because they held different job titles or there were "differentiating and mitigating circumstances involving each of those persons." Def. Mem. 11; *see id.* at 11-14. On Reply, Defendant concedes that McCullough may be an appropriate comparator but argues Plaintiff and McCullough were subjected to similar discipline. Reply 4-5.

The undersigned agrees with Defendant that neither Principal Holloman nor District Accounting Specialist Blackman would be an appropriate comparator. Although it is true that comparators need not hold the same jobs, to be considered appropriate comparators for this portion of the analysis the similarities must be sufficiently similar so as to be relevant. Here, the roles of Holloman and Blackman as to the athletic money were far more supervisory in nature. Plaintiff's attempt to put their failure to "catch" the lack of deposits/failure to pay officials on the same plan as those with first-line responsibility to account for the money and pay officials stretches the concept of an appropriate comparator too far. Their "conduct" was simply different from Plaintiff's.

The court agrees with Plaintiff, though, that she has presented evidence sufficient to create at least an issue of fact as to whether Defendant treated Plaintiff and McCullough differently as regards the situation with the ticket money. Although Plaintiff was a bookkeeper and McCullough was a teacher and AD, they were subject to the same reporting structure—first to Principal Holloman and then to Superintendent Moss. They were subject to the same rules, and they were alleged to have been involved in the same or similar conduct. Indeed, Defendant concedes that Plaintiff potentially was "less culpable" than McCullough. Reply 4. This is borne out by the Sheriff's Department's Incident Report that initially listed McCullough as a "suspect" and Plaintiff only as a "witness." ECF No. 39-8. Defendant couches the discipline received by Plaintiff and McCullough as very similar, noting that the discipline Moss imposed was that neither Plaintiff nor McCullough could handle money any longer. Defendant submits that Plaintiff was given the option of applying for other classified positions

and would not have received a salary reduction until after June 2018. Accordingly, Defendant submits, Plaintiff's punishment was similar to McCullough's. Defendant points out that Plaintiff's not being a certified employee impacted the number of positions that were available to her. Based on Plaintiff's version of the facts, though, she was to receive a drastic salary reduction at the end of the month (March 2017). McCullough, on the other hand, lost only a small portion of her salary, that attributable to her AD stipend. The undersigned agrees with Plaintiff that she has presented an issue of fact as to whether Defendant treated the similarly situated McCullough, an African-American female approximately 25 years younger than she, differently.

Plaintiff has presented a prima facie case of race-based discrimination.[10] Accordingly, the court continues to the pretext portion of the burden-shifting analysis.

  b.   Pretext analysis:

"In order to show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact. Once the plaintiff offers such circumstantial evidence, the case must be decided by a trier of fact and cannot be resolved on summary judgment." *Haynes v. Waste Connections, Inc.*, 922 F.3d at 225 (citing *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001)). The court is mindful that there is nothing in the "*McDonnell Douglas* burden-shifting framework that says 'a plaintiff must always introduce additional, independent evidence of discrimination.'" *Guessous*, 828 F.3d at 220 (quoting *Reeves*, 530 U.S. at 149). Nonetheless, the court notes that "a prima facie case of discrimination combined with evidence of pretext might fail to sustain a jury's finding of liability, in unique situations where 'the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the

---

[10] The court also notes Defendant's argument that both Plaintiff and Superintendent Moss are Caucasian. While the fact that a decisionmaker and a plaintiff are members of the same protected group arguably diminishes any inference of race discrimination, it is not dispositive of whether discrimination occurred. *See Ferguson v. Waffle House, Inc.*, 18 F. Supp. 3d 705, 722 (D.S.C. 2014).

employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.'" *Burgess v. Bowen*, 466 F. App'x 272, 277–78 (4th Cir. 2012) (quoting *Reeves*, 530 U.S. at 148).

Prior to *Reeves*, some circuits—including some Fourth Circuit decisions—required what was known as the "pretext-plus" standard, requiring not only that an employee-plaintiff show pretext by undercutting his or her employer's legitimate, nondiscriminatory reason for its action, but also requiring the employee to introduce evidence that showed a "specific and discriminatory motive." The Fourth Circuit recently reiterated that the so-called "pretext -plus" standard employed before the *Reeves* decision had been abrogated. An employee may show pretext by undercutting his employer's justification for termination or other adverse action. The employee is not also required to introduce evidence that shows a "specific and discriminatory motive." *Westmoreland v. TWC Admin. LLC*, 924 F.3d at 727.

Defendant submits it had a legitimate, nondiscriminatory reason for its actions in removing Plaintiff from her position that included the handling of money. Defendant submits, though, that Plaintiff has "presented no evidence that such a decision was pretextual." Def. Mem. 14.

In opposing summary judgment and in attempting to establish pretext, Plaintiff presents the following evidence:

- Plaintiff did not engage in wrongful conduct.
- She was not McCullough's supervisor and had no authority to discipline McCullough or others. Walton Dep. 101-02; Bishop Dep. 29.
- Plaintiff also submits it was not her job to "bother the AD about gate money or Ticket Seller Reports," and that she did not break any "work rule" in regard to not "catching the missing money and invoices earlier." Pl. Mem. 23 (citing Walton Dep. 160-61, *pages that are not currently included in the court record*).
- Plaintiff herself never filled out a Ticket Seller Report. Pl. Dep. 71. Rather, it was the AD's job to collect the money from the gate, count it, prepare a Ticket Seller Report, and to deliver those items to the bookkeeper. The AD was also required to turn over all invoices to the bookkeeper. Pl. Dep. 46, 53; Bishop Dep. 59-60;
- Plaintiff was never instructed that it was her responsibility to go to the AD and ask for deposits (nor was she told she was not permitted to do so). Pl. Dep. 54.

- Plaintiff did not fail to pay referee invoices because, for the first time in her bookkeeping career, she had not received any such invoices prior to being advised on October 31, 2016 that invoices were unpaid.
- Plaintiff also cites to comparator evidence—that others with more culpability received lesser discipline.

Pl. Mem. 23-24.

On reply, Defendant responds to Plaintiff's pretext argument only in the context of her age-discrimination claim, arguing Plaintiff "has presented no credible evidence that [Defendant's legitimate basis for its actions] was pretextual." Reply 9. Defendant submits that Plaintiff's evidence is, "[a]t most" an argument that the District's expectations were not legitimate, submitting that "no factfinder could reasonably conclude that an employer would have no basis to find fault in and discipline the bookkeeper either for not recognizing that she had received no ticket sales for two months or for recognizing that and not reporting it to the RSIA principal so that corrective action could be taken." *Id*. Defendant argues that "there is no evidence that would remotely suggest that former Superintendent Moss' actions were based, solely or otherwise, on [] discrimination." *Id*.

For purposes of this Report the undersigned also considers Defendant's argument regarding pretext in the context of the race discrimination claim. Having considered such argument the undersigned is of the opinion that Plaintiff has submitted sufficient evidence from which a reasonable juror could find Defendant's actions pretextual. Admittedly, this is a close call. However, as noted above, Defendant's argument that there is "no evidence" suggesting discrimination would impermissibly be applying the outmoded "pretext plus" standard. However, Plaintiff need not proffer evidence of a specific discriminatory motive behind the District's actions. *Westmoreland*, 924 F.3d at 727. Rather, Plaintiff must present evidence that undercuts Defendant's actions. *Id*. Here, the impact of the punishment meted out to Plaintiff was far more harsh than that imposed on McCullough, the admittedly more-culpable employee. *See Cole v. Family Dollar Stores of Md., Inc.*, No. 18-2043, 2020 WL 2116513, at *4 (4th Cir. Apr. 27, 2020) (noting comparator evidence is useful in assessing pretext) (citing *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013)).

The undersigned is also mindful of the evidence presented by Plaintiff concerning the knowledge Principal Holloman had as to McCullough's inability to be included as a signator on the Athletic Booster bank account. *See* ECF No. 46-3 at 32. Notably, there is no evidence that Plaintiff was aware of this. The court further notes Plaintiff's testimony that Holloman initially advised Plaintiff that she would "take care of" the situation concerning McCullough and the money.

Certainly, the court does not sit as a "kind of super-personnel department weighing the prudence of employment decisions," *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (internal quotation marks omitted), and may not "second guess the wisdom of business decisions," *EEOC v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir. 1992). As noted in *Westmoreland*, though,

> [N]othing bars a jury from considering an employee's tenure and performance in evaluating whether her employer's justification for her termination is so flimsy as to be *untrue* or *implausible*, and thus asserted in an attempt to mask a discriminatory motive. *See, e.g.*, *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) (finding jury question as to pretext, in part because employee was terminated for minor scheduling issues and typos); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc) (noting pretext may be established by showing that a justification "was insufficient to warrant the challenged conduct" (internal quotation marks omitted)); *Kempcke*, 132 F.3d at 447 (holding "a reasonable factfinder could conclude" that firing employee for merely "giving innocently acquired documents to his attorney" was "an extreme overreaction" and therefore pretextual); *cf. Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 (4th Cir. 2003) (finding plaintiff's strong qualifications relevant to question of pretext in mixed-motives race discrimination case).

*Westmoreland*, 924 F.3d at 728 (emphasis in original). In *Westmoreland*, the Fourth Circuit found plaintiff had provided evidence sufficient to show her termination was pretext for discrimination, noting the jury could consider the nature of her violation (misrepresentation of a date on a form), her long and satisfactory work history, and her employer's initial indication that her violation merited no more than a "slap on the wrist." A jury could make a similar inference in considering the facts of this case.

Although recommending that summary judgment be denied as to Plaintiff's race-discrimination claim, the undersigned notes there is significant evidence that could persuade a trier of fact to find Defendant's handling of the situation with Plaintiff ultimately was nondiscriminatory.

Based on the facts before the court, however, the undersigned is of the opinion that a jury could find otherwise, making summary judgment inappropriate.

### C. Age-based discrimination (ADEA)

"The ADEA prohibits employers from refusing to hire, discharging, or otherwise discriminating against any person who is at least 40 years of age 'because of' the person's age." *EEOC v. Baltimore Cnty.*, 747 F.3d 267, 272 (4th Cir. 2014) (citing 29 U.S.C. §§ 623(a)(1), 631(a)). Plaintiff is proceeding under the *McDonnell Douglas* burden-shifting scheme. To establish a prima facie case of age discrimination under *McDonnell Douglas*, Plaintiff must demonstrate that: "(1) [s]he is a member of a protected class, (2) [s]he suffered an adverse employment action (such as discharge), (3) [s]he was performing his job duties at a level that met the employer's legitimate expectations at the time of the adverse employment action, and (4) [her] position remained open or was filled by a similarly qualified applicant outside the protected class." *Baqir v. Principi*, 434 F.3d 733, 742 (4th Cir. 2006). The fourth element may be met with evidence that a substantially younger individual—not necessarily one outside the protected class—replaced Plaintiff. *Westmoreland*, 924 F.3d at 725; *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002).

If the plaintiff makes a prima facie showing, then the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action. *Dugan*, 293 F.3d at 721. If the employer comes forward with such a reason, "the burden reverts to the plaintiff to establish that the employer's nondiscriminatory rationale is a pretext for intentional discrimination." *Heiko v. Colombo Sav. Bank*, 434 F.3d 249, 258 (4th Cir. 2006). This requires proof of "but-for" causation. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

### a. Prima facie case

Plaintiff was 67 during the 2016-17 school year, and unquestionably was a member of the class protected by the ADEA. Although Defendant challenges whether Plaintiff satisfies the second and third prongs of the prima facie case—suffering an adverse action and performing in a manner to

meet Defendant's legitimate expectations—the undersigned finds she has satisfied those prongs for the reasons articulated above in connection with the Title VII analysis.

The court now considers the fourth prong—whether Plaintiff's position remained open or was filled by someone substantially younger. Plaintiff again argues she can establish the fourth prong because the position remained open for over three months—from the end of March 2017 (when she was separated from employment) until July 10, 2017 (when Dorsey began work). Further, she submits the performance of 80% of the bookkeeping duties by Blackman, who, at 56, was 11 years younger than Plaintiff at that time, satisfies this prong of the prima facie case. Further, Plaintiff notes that her position was filed by Dorsey, who was 50 years old at the time, and plainly "substantially younger" than Plaintiff. Pl. Mem. 21. Defendant does not focus its argument on this prong of the ADEA prima facie case. The undersigned agrees with Plaintiff that she has satisfied this prong of the prima facie ADEA case.[11] Plaintiff has satisfied her light burden of demonstrating a prima facie case of age-based discrimination.

b. Pretext analysis

As noted above, Defendant has set out a legitimate, nondiscriminatory reason for its actions toward Plaintiff. The burden shifts to her to show by a preponderance of the evidence that her age was a but-for cause of her constructive discharge. *Gross*, 557 U.S. at 177-78. Plaintiff relies on the same evidence to establish pretext for her ADEA claim as she did for her Title VII/§ 1981 claim. Defendant again argues Plaintiff has not shown pretext. Further, Defendant focuses on the ADEA's stricter "but-for" causation standard in considering whether Plaintiff has shown pretext. Reply 7-8. Defendant again erroneously suggests, though, that Plaintiff is required to show "evidence that her

---

[11] Plaintiff also argues she can satisfy the fourth prong of her prima facie ADEA claim with comparator evidence. For reasons discussed above, the undersigned finds McCullough was Plaintiff's only appropriate comparator. McCullough, 42 years old, was substantially younger than Plaintiff. As discussed above, Plaintiff has created at least a question of fact as to whether McCullough was treated differently from her. She can establish this prong of her prima facie ADEA claim in this way, as well.

age played a[] role" in Defendant's decisions. *Id.* at 8. Again, "pretext plus" is not the standard. *Westmoreland*, 924 F.3d at 728.

As noted above, the undersigned is generally of the opinion that Plaintiff has set out evidence from which a jury could find pretext. However, as noted by Defendant, the standard is stricter for an ADEA claim: Plaintiff must show Defendant would not have taken the action it took in the absence of age discrimination. Def. Mem. 17-18 (citing *Gross*, 557 U.S. at 176); Reply 7-8 (quoting *Westmoreland*, 924 F.3d at 725).[12]

For many of the same reasons set out in connection with the Title VII/§ 1981 claim, the undersigned is of the opinion that Plaintiff has set out evidence from which a reasonable juror could find that her age of 67 was a but-for cause of the disproportionate, uneven discipline that led to Plaintiff's termination. A substantially younger individual undertook some of her duties for months and then an even-younger individual replaced her in July 2017. Further, Plaintiff's significantly younger comparator, McCullough, was subjected to far-less serious discipline for her arguably far-more serious malfeasance. Summary judgment should be denied as to Plaintiff's claim of discrimination in violation of the ADEA.

D.  State-law-based slander claim

Finally, Defendant seeks summary judgment as to Plaintiff's remaining claim—a claim of slander per se brought pursuant to South Carolina common law. Compl. ¶¶ 70-77; *see* Def. Mem. 20-24. As noted by Defendant (and not objected to by Plaintiff), relevant South Carolina law provides as follows:

> "The tort of defamation permits a plaintiff to recover for injury to his reputation caused by the defendant's communication to others of a false message about plaintiff." *McBride v. School District of Greenville County*, 389 S.C. 546, 698 S.E.2d 845, 852 (Ct. App. 2010). "To prove defamation, the plaintiff must show: (1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third

---

[12] Notably, nowhere in Plaintiff's memorandum does she address this argument. Rather, she discusses only the ADEA prima facie claim separately. Pl. Mem. 18-21. She makes her pretext argument applicable to all of her federal causes of action, offering no distinction for the heightened standard required to show pretext in an ADEA claim. *Id.* at 22-28.

party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Id*. "In order to succeed on a defamation claim, the plaintiff must show that the challenged statement is both defamatory (tending to impeach the plaintiff's reputation) and actionable (injuring the plaintiff)." *White v. Wilkerson*, 328 S.C. 179, 493 S.E.2d 345, 347 (1997). "It is the trial court's function to determine initially whether a statement is susceptible of having a defamatory meaning." *Id.*

Def. Mem. 21. Defendant argues that Plaintiff's slander claim should be denied because it lacks the specificity required of a defamatory statement. *Id.* Further, Defendant seeks judgment as a matter of law as to various defenses, including that nothing defamatory was communicated to a third party, any communication by Defendant to law enforcement would be at least qualifiedly privileged and, furthermore, would be subject to sovereign immunity under the South Carolina Tort Claims Act. *Id.* at 21-23.

In responding to summary judgment Plaintiff clarifies the basis for her claim of slander per se: "Defendant slandered Presley by terminating her on the heels of an investigation into missing money." Pl. Mem. 28. Plaintiff notes that, "within days of suspending plaintiff and McCullough, the defendant called law enforcement to report theft." *Id.* Further, the investigation took a month and a half and included having a uniformed officer visit the school and interview individuals, including Bishop. *Id.* at 28-29 (citing Bishop Dep. 32-35). "Thereafter," Plaintiff submits, Defendant "forced plaintiff to resign and retire," which resulted in her "never return[ing] to work after the public investigation by law enforcement." *Id.* at 29. Plaintiff submits that "[t]his gave other employees and those having dealings with the school the feeling and belief that Presley had committed a crime and/or that she was discharged for stealing money of for some other illegal conduct." *Id.* (citing *Tyler v. Macks Stores of S.C., Inc*. 272 S.E.2d 633 (S.C. 1980)). Plaintiff does not respond to the defenses offered by Defendants.

*Tyler v. Macks Stores* provides that "a defamatory insinuation may be made by actions or conduct as well as by word." 272 S.E.2d at 634. Defamation "need not be accomplished in a direct manner" and a "mere insinuation is as actionable as a positive assertion if it is false and malicious

and the meaning is plain." *Id.* In *Tyler*, the Supreme Court of South Carolina upheld the trial court's denial of a demurer (akin to a Rule 12(b)(6) motion to dismiss), when a plaintiff was terminated just after having submitted to a polygraph examination for wrongful activity. In *Fountain v. First Reliance Bank*, the court quoted *Tyler* and noted, "'To render the defamatory statement actionable, it is not necessary that the false charge be made in a direct, open and positive manner. A mere insinuation is as actionable as a positive assertion if it is false and malicious and the meaning is plain.'" 730 S.E.2d 305, 309 (S.C. 2012) (quoting *Tyler*, 272 S.E.2d at 634). Construing all inferences in her favor, the undersigned agrees that Plaintiff has created an issue of fact as to whether a defamatory statement could be insinuated. Plaintiff was placed on leave so that law enforcement could conduct an investigation. Subsequently, she left her employment with the district. Defendant's point on reply that Plaintiff retired and no one was told she as terminated is well-taken. Nonetheless, Plaintiff was placed on administrative leave during the investigation and she ultimately did not return to employment. An issue of fact is created as to whether a defamatory statement might be insinuated.

This does not entitle Plaintiff to the denial of summary judgment, however. Plaintiff fails to address Defendant's further arguments in support of summary judgment: that any defamatory statement was qualifiedly privileged and not made with actual malice or that, even if found have been made with actual malice, the claim against Defendant would be dismissed based on the sovereign immunity afforded by the South Carolina Tort Claims Act. Def. Mem. 23-24. As noted by Defendant, South Carolina law provides for a qualified privilege when an employee's job performance is being evaluated. *See Wright v. Sparrow*, 381 S.E.2d 503, 507 (S.C. Ct. App. 1989). As noted in *Harkness v. City of Anderson*, though,

> [T]he speaker can lose this qualified privilege by speaking with actual malice. *See Constant v. Spartanburg Steel Prods., Inc.,* 316 S.C. 86, 447 S.E.2d 194, 196 (S.C.1994). "Actual malice can mean the defendant acted recklessly or wantonly, or with conscious disregard of the plaintiff's rights." *Id.* "[T]he burden will be upon the plaintiff to show . . . actual malice." *Bell,* 38 S.E.2d at 643.

*Harkness v. City of Anderson, S.C.*, No. C.A. 8:05-1019-HMH, 2005 WL 2777574, at *5 (D.S.C. Oct. 25, 2005). Plaintiff has not responded to Defendant's arguments that it is entitled to summary judgment based on privilege or, alternatively, based on sovereign immunity. Accordingly, at this juncture, Plaintiff has not met her burden of showing Defendant acted "recklessly or wantonly." The court will not create arguments for Plaintiff. Summary judgment as to Plaintiff's claim of slander per se should be granted.

IV.     Conclusion

For the reasons set forth above, the undersigned recommends Defendant's Motion for Summary Judgment, ECF No. 39, *be denied as to her claims of race-based and age-based discrimination, and granted as to her claim of defamation per se.*

IT IS SO RECOMMENDED.

July 9, 2020                                                       Kaymani D. West
Florence, South Carolina                                   United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**